# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Roman*, 2013 IL App (1st) 110882

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARTIN ROMAN, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-0882 |
| Filed | November 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's murder conviction was reversed and the cause was remanded for a new trial where prejudicial gang evidence that was not related to defendant's identification and had no probative value to any issue in the case was improperly admitted at defendant's trial and the State's courtroom cart bore a "Gang Unit" sticker, notwithstanding the State's contention that the gang evidence established a motive for an otherwise inexplicable act, since evidence that defendant is a gang member or involved in gang activity is admissible only when there is sufficient proof gang membership or activity is related to the charged crime, and in defendant's case, such proof was lacking and the admission of the gang evidence was reversible error. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-03180; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Kristen E. Mueller, of State Appellate Defender's Office, of Chicago, for appellant. |

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People.

| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion. |

Justices Pucinski and Mason concurred in the judgment and opinion.

## OPINION

¶ 1    Determining whether the State is introducing evidence of gang membership for a relevant and permissible purpose or for an illegitimate and highly prejudicial effect can present the trial judge with a difficult task. At issue, of course, is the fundamental right to a fair trial.

¶ 2    The admission of gang-related evidence is at the core of this appeal, in which a jury convicted the defendant, Martin Roman, of murder. He and several codefendants had beaten to death a factory employee in the parking lot where the victim worked. The trial court sentenced Roman to 32 years in prison. Roman contends several errors by the trial court are grounds for reversing his conviction, including the admission of testimony and photographic evidence that Roman was a member of a street gang.

¶ 3    Although we consider the crime and the defendant's conduct to be reprehensible, the admission of gang-affiliation as to Roman was of no probative value. The State contends it "was introduced for the limited purpose of showing the circumstances surrounding defendant's identification," but the record reveals that the gang evidence had nothing to do with witness identification of Roman Martin, or with any other issue. Accordingly, his conviction must be reversed and the case remanded for a new trial.

¶ 4                            BACKGROUND

¶ 5    In the early hours of December 24, 2007, Francisco Reyes was beaten and killed by a group of men in the parking lot of a tortilla factory in Chicago. Martin Roman and five other men, Daniel Roman, Carlos Lopez, Ismael Morales, Omar Morales, and Adolfo Zuniga, who lived in the neighborhood, were later arrested and charged with first degree murder and robbery. (All references to "Roman" refer to Martin Roman; Daniel Roman will be identified with his first and last names.) Roman and Zuniga were tried together after their codefendants had been tried and convicted. Before trial, defendants' attorneys sought to bar the State from

presenting evidence regarding an incident on December 4, 2007, when three men beat a man in the factory parking lot and smashed car windows. The trial court denied the request finding the evidence more probative than prejudicial because it supported the State's theory of a motive for the murder. The defense also asked the court to preclude the State from presenting gang-related evidence at trial. Specifically, defense counsel sought to prevent the State from using photographs of defendants' gang tattoos, arguing they were prejudicial and served no purpose other than to inflame the jury. The trial court denied that motion on the grounds that the photographs supported the State's theory that the offense was gang-related and corroborated the witnesses' identifications of the perpetrators. The trial court also refused defense counsel's request that the State remove or cover a "Gang Unit" sticker from the cart they used in the courtroom, despite the State's offer to do so. The judge stated the sticker "never mattered to a jury before" and expressed concern that the prosecution might lose the cart without it.

¶ 6        The State's evidence at trial consisted primarily of the testimony of three eyewitnesses, Sylvia Ortiz, Fernando Garcia, and Juliana Flores, who all saw the murder occur. Ortiz and Garcia lived with their son on the second floor of an apartment building across the street from the tortilla factory. They said they watched the crime from separate windows facing the parking lot. Flores was with her boyfriend, who lived downstairs from Ortiz and Garcia. She too watched the beating from an apartment window.

¶ 7        Ortiz testified that on December 4, 2007, a few weeks before the murder, she heard a banging noise outside at about 1 a.m. She looked out her window and saw three men hitting the factory door with baseball bats. Ortiz recognized all three men, Martin Roman, Daniel Roman, and Ismael Morales, because she frequently saw them hanging around the neighborhood. When no one opened the factory door, Ortiz saw the men break car windows in the parking lot. Ortiz called the police, who arrived about 15 minutes later.

¶ 8        One of the factory employees, Pedro Martinez, testified he arrived at work on the evening of December 3 and saw a group of young men, including codefendant Zuniga, hanging out on the corner near the factory. Later that evening, a man whom Martinez had not seen before came to the factory to sell a car jack. A few minutes later, another man came into the factory. He had been beaten up and his face was bleeding. After letting the injured man in, one of the employees closed the factory door. Later, loud banging on the door could be heard and the two men stayed in the factory until the banging stopped. Martinez went outside and saw that his car windows were broken and another car was damaged. Martinez saw the same crowd of five or six young men, including codefendants Zuniga, Carlos Lopez, and Omar Morales, standing on the corner. He testified that he saw this group near the factory almost every day when he arrived at and left work.

¶ 9        About three weeks later, shortly after midnight on December 24, Ortiz and Garcia were home when they heard a voice outside. They both recognized the person speaking as Daniel Roman, who was talking on a cell phone. Ortiz said Daniel Roman told the person on the phone to come over because there was someone they were going to beat up. Garcia heard Daniel Roman say "come help me. There is a person who works at the factory that we can beat up. Come on. Let's fuck him up." Soon after, Roman, Carlos Lopez, Ismael Morales, and Omar Morales arrived. Garcia and Ortiz recognized them because they had seen them

-3-

hanging out in the neighborhood every day for four or five years. After the men gathered, they ran toward the factory parking lot where Francisco Reyes was driving a forklift. Juan Ramirez, one of Reyes's coworkers, testified that a supervisor had sent Reyes out to the parking lot shortly before the murder to unload a shipment of corn. The men grabbed Reyes off the seat of the forklift, forced him to the ground, and began hitting and kicking him.

¶ 10    At some point, Adolfo Zuniga arrived in a car and joined the others in beating Reyes. Then one of the men went across the street and picked up a concrete rock. Garcia testified Ismael Morales dropped the rock on Reyes's head and Carlos Lopez dropped the rock on him a second time. Ortiz also testified that a rock was dropped on Reyes's head twice, but did not identify who dropped it. Ortiz said that as Reyes lay on the ground, one of the men removed a wallet and some pieces of paper from Reyes's pocket and, after striking Reyes with the rock, scattered.

¶ 11    Inside the factory, a supervisor asked Juan Ramirez to check on Reyes because he had not returned from unloading the corn. Ramirez found Reyes lying on his back in the parking lot. He ran back into the factory to call 911. Reyes was taken to a hospital where he died the next day. The medical examiner testified that the cause of death was cranial cerebral injuries due to assault.

¶ 12    Detectives Roberto Garcia and Peter Maderer investigated the murder. On December 27, Fernando Garcia went to the police station and told Detective Garcia what he saw the night of the murder. He testified he did not come forward earlier because he feared retribution, particularly because the uncle of some of the perpetrators lived in the apartment below his. Fernando Garcia identified photos of Roman, Daniel Roman, Ismael Morales, Omar Morales, Adolfo Zuniga, and Carlos Lopez as the perpetrators. Garcia also viewed three in-person lineups. At the first, he identified Omar Morales as one of the perpetrators. At the second, he identified Roman, Ismael Morales, Daniel Roman, and Adolfo Zuniga. At the third, he identified Carolos Lopez. Garcia, at trial, made an in-court identification of Roman as one of the men who beat Reyes. He also testified that he was "one hundred percent sure" Roman, Daniel Roman, and Ismael Morales were members of a street gang, the Latin Kings, because he often saw them in the neighborhood making gang signs and yelling at passing cars. The State also asked Garcia to illustrate the Latin Kings' gang sign and yell the gang's slogan, "King Love," during his testimony.

¶ 13    On January 1, 2008, Sylvia Ortiz spoke to Detective Garcia at the police station. She testified she did not speak to the police on the night of the murder because she was afraid since the Morales brothers were related to her downstairs neighbor. The police showed Ortiz a photo array. She identified Roman, Ismael Morales, and Daniel Roman as three of the perpetrators but failed to identify Zuniga, who appeared in one of the photos. Ortiz later viewed three in-person lineups. At the first, she identified Roman, Ismael Morales, and Daniel Roman, and made a tentative identification of Zuniga. At the second lineup, she identified Omar Morales. At the third lineup, she identified Carlos Lopez. Ortiz also identified Roman in court. She testified that she did not know whether Roman or any of his codefendants were gang members but frequently saw them hanging out on the corner.

¶ 14    The State also presented Juliana Flores as a witness. Flores testified that on the night of

the murder she was staying at her boyfriend's apartment in the same building as Ortiz and Garcia, across the street from the factory. At about 1:15 a.m., Flores heard a man talking outside. When Flores looked out the window, she saw Daniel Roman talking on his cell phone and heard him say something about beating someone up. She then heard people running and looked out the window to see a group of men running toward a man on a forklift. Flores said she looked away. The next time she looked out the window, she saw that the man on the forklift was on the ground and the men were kicking and punching him. Flores testified that the perpetrators included Roman, Daniel Roman, Omar Morales, Ismael Morales, and Carlos Lopez, and that codefendant Zuniga arrived later and joined in on the beating. Flores said she had a clear view from her window but did not see the entire beating incident because she was looking out the window every once in a while.

¶ 15    Flores and her boyfriend, Jaime Gonzalez, went to the police station on December 24, 2007, and spoke with Detective David Roberts. Flores gave Detective Roberts the first and last names of Roman, Daniel Roman, and Ismael Morales and the first names, approximate ages, and location of three other individuals. Flores returned to the police station on January 9, 2008, where she viewed photographs and a lineup. In the lineup, Flores identified Roman, Daniel Roman, and Ismael Morales as three of the men who took part in the beating. From photographs, Flores identified six men, including the defendant, as the men who beat Reyes. Flores testified that she knew the men because she had seen them in the neighborhood and her boyfriend had introduced her to them. Flores also said her boyfriend was a member of the Latin Kings street gang and that he used to hang out with Roman and his codefendants, who were also Latin Kings.

¶ 16    Michael Delacy, an investigator with the Cook County States Attorney's office, testified that he took photographs of Roman's tattoos. The State published those photos, which showed numerous gang-related tattoos on Roman's upper body. Before Delacy's testimony, the defense renewed their objection to the introduction of gang evidence because they argued there was no connection between defendant's gang membership and the witnesses' identification of the perpetrators. The trial court disagreed, stating that some of the witnesses could identify the perpetrators because they frequently saw them flashing gang signs in the neighborhood.

¶ 17    Detective Garcia testified about the lineups he conducted with the three eyewitnesses, Flores, Garcia, and Ortiz, where they each identified Roman as one of the perpetrators of the December 24 attack on Reyes. Also, over defense counsel's objection, the State showed Detective Garcia photographs of Roman's tattoos and asked him about their significance. Detective Garcia testified that the tattoos showed that Roman was a gang member. Specifically, Garcia stated that the tattoo of a five point crown and the tattoo of the letters "LK" identified Roman as a member of the Latin Kings and that a tattoo with the number "25," and the word "Cal" indicated Roman belonged to the 25th Street and California Avenue branch of the gang. After Garcia testified, defense counsel asked the State to produce documents showing Garcia was a gang expert. The trial court denied the request stating, "I don't think you need to be an expert to read 25 and Cal ***. I think everybody in the neighborhood knows the symbolism of the gang symbols depending on where they live and what they're about. *** He's been working 16 years, and does these kinds of cases all the

time. You could cross-examine him about that if you wish."

¶ 18    Roman did not testify or present any witnesses. Following closing arguments, the jury deliberated and found Roman guilty of first degree murder. Zuniga, Roman's codefendant was acquitted. In his motion for a new trial, Roman argued, in part, that the trial court erred in permitting the State to present gang evidence and pictures of Roman's tattoos. The trial court denied the motion and sentenced Roman to 32 years in prison. Roman's motion to reconsider his sentence was denied. Roman filed this timely appeal.

¶ 19                                              ANALYSIS

¶ 20    Roman raises five issues on appeal, three involving errors by the trial court and two involving errors by his defense counsel and the State. The first error deals with the trial court's admission of gang-related evidence, namely, testimony from two witnesses that Roman was a member of the Latin Kings street gang, photographs of Roman's tattoos, and testimony from Detective Garcia that the tattoos showed that Roman was affiliated with the Latin Kings. The other alleged errors involve comments by the trial judge to a potential juror during *voir dire* and his compliance with the requirements of Illinois Supreme Court Rule 431(b) (eff. July 2, 2012), the State's remarks during closing argument, and the effectiveness of defense counsel in allowing the jury to be given an exhibit showing that Roman's codefendants had been convicted in four separate trials. Because we agree with Roman's first contention, that the trial court erred in permitting the State to introduce gang-related evidence during trial we reverse and remand on that basis alone. Further, we also address the trial court's questioning of potential jurors during *voir dire* in an effort to resolve problems that can arise due to the language of Rule 431(b).

¶ 21                                          Gang Evidence

¶ 22    Roman contends he was denied his right to a fair trial when the State presented prejudicial gang evidence that had no probative value in the case. Roman asserts the trial court erred in finding that the evidence of gang membership substantiated the witnesses' identifications, because all of the witnesses testified they knew him and his codefendants from seeing them in the neighborhood over several years. Roman also argues the trial court erred in finding his gang membership was probative of a motive in the case, because the State presented no evidence or testimony showing the murder was a gang-related crime. Roman further contends the trial court erred in permitting the State to show pictures of Roman's tattoos and to have Detective Garcia testify that the tattoos were evidence Roman was a gang member without first qualifying Detective Garcia as an expert. The State maintains the gang evidence was admissible to strengthen the eyewitnesses' identification of Roman and to support its theory of the case. Alternatively, the State asserts that even if the trial court did err in admitting gang evidence, Roman cannot show he was unfairly prejudiced by it.

¶ 23    Relevant evidence is "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991). Our supreme

court has held "any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased." *People v. Smith*, 141 Ill. 2d 40, 56 (1990). It is the function of the trial court to weigh the probative value of the evidence against the risk of unfair prejudice it carries; we will not overturn a court's decision on that balancing process absent a clear abuse of that discretion. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003).

¶ 24    Generally, evidence a defendant was a gang member or involved in gang-related activities is admissible to show a common purpose or design or to provide a motive for an otherwise inexplicable act. *Smith*, 141 Ill. 2d at 58. There may be a strong prejudice against street gangs, however, so a trial court should take great care when exercising its discretion to admit gang-related testimony. *People v. Davenport*, 301 Ill. App. 3d 143, 152 (1998) (citing *People v. Lucas*, 151 Ill. 2d 461, 487-89 (1992)). A defendant cannot automatically be assumed to be guilty based on membership in an undesirable group. *People v. Matthews*, 299 Ill. App. 3d 914, 923 (1998).

¶ 25    Evidence a defendant is a gang member or is involved in gang activity is admissible only where there is sufficient proof "membership or activity in the gang is related to the crime charged." *People v. Strain*, 194 Ill. 2d 467, 477 (2000). "To ensure a careful exercise of discretion, a trial court should require the prosecution to demonstrate a clear connection between the crimes and the gang-related testimony." *People v. Weston*, 2011 IL App (1st) 092432, ¶ 23. Where the State's theory of gang-related motive is not supported by the evidence, the only purpose for telling the jury that the crime was gang related could be to inflame the passion or arouse prejudice against gangs. *Smith*, 141 Ill. 2d at 62.

¶ 26    The trial court found and the State asserts here that evidence regarding Roman's membership in the Latin Kings was admissible because it strengthened the witnesses' identifications of Roman as one of the perpetrators. For support, the State relies on *People v. Gonzalez*, 142 Ill. 2d 481 (1991). In *Gonzalez*, defendant was convicted of armed robbery and aggravated battery for stealing the victim's bike and punching the victim in the face. *Gonzalez*, 142 Ill. 2d at 485. The victim told the police the defendant hung out with a group of boys the victim knew were members of the Spanish Cobra street gang, because he saw them flashing gang signs to a passerby. *Id.* The police showed the victim an album with photographs of 75 to 100 Spanish Cobra gang members, and the victim identified defendant. *Id.* at 486. The appellate court reversed defendant's conviction and remanded for a new trial, finding the evidence of street-gang activity irrelevant and, further finding that certain comments about gangs made by the prosecutor in closing argument denied the defendant a fair trial. *Id.* at 487.

¶ 27    In reversing the appellate court, the supreme court noted that the reliability of the victim's identification of defendant as the offender was the central issue in the case. *Id.* at 488. The court found that the gang evidence was relevant to the events leading to defendant's identification and arrest. *Id.* The court stated, "[t]he gang-related evidence was relevant to the jury's consideration of the steps in the investigation, and of the circumstances culminating in the defendant's arrest as the offender." *Id.* The court further found that because the probative value of the evidence outweighed its prejudicial effect, the gang-related evidence was "admissible for the purpose of showing 'the procedures and

-7-

circumstances leading to the arrest and identification of the defendant ***.' " *Id.* at 489.

¶ 28    This case is not analogous, however, because although two eyewitnesses, Garcia and Flores, testified they knew Roman to be a member of the Latin Kings street gang, that was not the basis for any of the eyewitnesses' identifications of Roman as one of the perpetrators in the crime. Garcia and Ortiz said they knew Roman and his codefendants because they had seen them in the neighborhood for four or five years. They both knew the men well enough to state that some of the men were cousins, that their uncle lived in their building, and that their grandmother lived in the neighborhood. They were also able to identify one of the codefendants, Daniel Roman, by his voice. Similarly, Flores testified that she saw Roman and his codefendants in the neighborhood and met several of them through her boyfriend. In addition, all three witnesses identified the defendant in a photo array, a lineup, and in court. Roman's membership in a gang was not the reason they were able to identify him, and given the inflammatory nature of gang-related evidence, the trial court should not have permitted the State to introduce this testimony.

¶ 29    The error in permitting witnesses to testify about Roman's gang membership was exacerbated when the State introduced into evidence pictures of defendant's tattoos and elicited testimony from Detective Garcia that the tattoos showed that Roman was a member of the Latin Kings. Although the State asserts the pictures help corroborate the eyewitnesses' identifications of Roman and his codefendants, none of the witnesses mentioned Roman's tattoos in their testimony or suggested the tattoos were an aid to identifying him as one of the perpetrators. Given that the photographs were not relevant to the witnesses' identification of the perpetrators, they could only serve to inflame the jury, and therefore, the trial court erred in permitting the State to present them at trial.

¶ 30    The trial court also erred in finding the gang evidence was admissible because it supported the State's theory that the murder was gang related. The State argues the gang evidence was permissible because it helped establish a motive for an otherwise inexplicable act. See *Smith*, 141 Ill. 2d at 58 (gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act). The State asserts the perpetrators killed the factory employee to avenge a perceived slight of the Latin Kings when factory workers gave shelter to two men a few weeks earlier. The State, however did not present any evidence at trial to support this theory of the case. First, neither Roman nor any of his co-defendants were charged with any gang-related offenses in connection with the murder. Second, although the State elicited testimony from Sylvia Ortiz and Pedro Martinez about the December 4 incident outside the factory, it failed to present evidence that the December 24 murder was in retaliation for a perceived slight to the Latin Kings. Finally, there was no evidence that either incident was gang related, as the eyewitnesses did not testify that the perpetrators flashed gang signs, yelled gang slogans, or did anything to indicate they were members of a gang during the December 4 incident or the December 24 murder.

¶ 31    During oral arguments, the State asserted that Roman's gang membership was relevant to show that the codefendants, who were all members of the same gang, hung out together and therefore, were likely to have committed this crime together. At trial, several witnesses testified that Roman and the codefendants were frequently seen hanging out together in the

neighborhood. In fact, some witnesses testified that one of Roman's codefendants was his brother and two of his codefendants were his cousins. Evidence that they were also members of a gang was not necessary to establish that the perpetrators knew each other and may have committed this crime together. Therefore, in the absence of any evidence that the crime was gang related and given the highly prejudicial nature of gang evidence, the trial court erred in finding it was admissible to support the State's theory of the case.

¶ 32    Following oral argument, the State filed a motion to cite *People v. Morales*, 2012 IL App (1st) 101911, as additional authority on the issue of gang evidence. *Morales* was an appeal by one of Roman's codefendants, Ismael Morales, following his conviction for the murder and robbery of Reyes. Like Roman, Morales argued the trial court erred by permitting evidence of his gang membership by one of the eyewitnesses and two police officers, because it gave rise to unfair prejudice that substantially outweighed the probative value of the evidence. *Morales*, 2012 IL App (1st) 101911, ¶ 37. Unlike Roman, Morales did not challenge the trial court's ruling that the gang evidence tended to strengthen the eyewitnesses' identification of the perpetrators but only that the gang evidence was unnecessary. *Id.* ¶ 42. The *Morales* court disagreed and affirmed the trial court, finding that the probative value of the limited gang evidence on the identification issue outweighed the danger of unfair prejudice. *Id.* ¶ 55. The court also found that the trial court did not abuse its discretion in permitting the police officers to testify about the perpetrators' possible gang membership because the testimony was limited and was part of a narrative explaining their investigation and why some witnesses were reluctant to speak with them. *Id.* ¶ 48.

¶ 33    The State urges this court to adopt the rationale in *Morales* and affirm the trial court's decision to admit evidence of gang membership. *Morales* is distinguishable in several important respects, however. First, the trial court in *Morales* gave a limiting instruction, telling the jurors " 'you are getting this information not just to brand people as [gang members] or anything else, but you're getting this because this is [the] basis of the witness identification. *** [That] is why you're being allowed to hear about it. That's why its relevant as it goes to part of the reason he is able to make identifications in court in this trial.' " *Morales*, 2012 Il App (1st) 101911, ¶ 14. In affirming the trial court, the *Morales* court mentioned this limiting instructions several times, noting that it "ameliorate[d] the prejudice arising from the gang evidence." *Id.* ¶ 49. In Roman's trial, as the State concedes, the jurors received no similar instruction informing them of the limited purpose for admitting the gang evidence that might ameliorate the prejudicial effect of that evidence.

¶ 34    The *Morales* court also emphasized that the gang evidence was limited in scope and offered solely for the purpose of identification and to explain why some witnesses were initially reluctant to come forward and speak to the police. *Id.* ¶ 48. Here, the evidence was not nearly as limited. The jury was shown pictures of tattoos on Roman's chest and Detective Garcia was permitted to describe each and explain how they were evidence that he was a gang member. This evidence and testimony was not offered to support any eyewitnesses' identifications. Nor was it offered as part of the police investigation.

¶ 35    We further note that unlike in *Morales*, the gang evidence was not necessary to explain why the eyewitnesses were initially reluctant to talk to the police. Garcia and Ortiz testified they were afraid to talk to the police because the defendants' families lived down the block

and their uncle lived in their building. Therefore, evidence of gang membership was not necessary to explain their delay in coming forward on the record before us. Given the absence of a limiting instruction or a connection between Roman's gang membership and the reluctance of the witnesses to speak with police, *Morales* does not apply here.

¶ 36   The State contends that even if the gang evidence was erroneously admitted, the error was harmless and the conviction should stand because the evidence of Roman's guilt was overwhelming. "The erroneous admission at trial of *** gang evidence does not automatically warrant reversal." *People v. Easley*, 148 Ill. 2d 281, 330 (1992). This error "is harmless where the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *Davenport*, 301 Ill. App. 3d at 153. "The effect of inflammatory evidence depends upon the circumstances of the case." *Easley*, 148 Ill. 2d at 330.

¶ 37   The State's evidence at trial consisted primarily of three eyewitnesses who identified Roman as one of the perpetrators in the December 24 murder, which occurred in a parking lot across the street at about 1 a.m. There was no physical evidence tying Roman to the crime. We cannot say beyond a reasonable doubt that the gang-related evidence admitted at trial, including Flores' testimony that Roman was a member of the Latin Kings, Garcia's testimony that he frequently saw Roman and his codefendants flash gang symbols and yell at cars in the neighborhood, as well as his display of the Latin Kings' gang sign and slogan in court, and Detective Garcia's testimony regarding the gang significance of Roman's tattoos, pictures of which were shown to the jury, did not contribute to Roman's conviction in the absence of physical evidence tying him to the crime. Therefore, given the strong prejudice against street gangs and the likelihood that the effect, if not the purpose, of the gang-related evidence was to stir the emotions of the jury, combined with the absence of any relevance to a motive or the witnesses' identifications of the perpetrators, we find the admission of this evidence was reversible error.

¶ 38   One further point, though minor in comparison to the preceding issues. The trial court refused to grant defense counsel's request to remove the "Gang Unit" sticker from the State's courtroom cart, despite the State's offer to do so. The trial court's refusal was unreasonable. The presence of the "Gang Unit" sticker on the cart has the potential to negatively impact the defense given the strong prejudice against street gangs. Whether the case involves gang affiliation or not, fairness dictates the cart be identified with a sticker that does not transmit a potentially prejudicial message, especially when an innocuous alternative is so easy. Just as gang-related symbols and regalia are prohibited in court, so should the "Gang Unit" sticker.

¶ 39                               Supreme Court Rule 431(b)

¶ 40   Roman argues the trial court erred by failing to disqualify biased jurors who said during *voir dire* that they could not adhere to the four principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The rule codifies the Illinois Supreme Court's holding in *People v. Zehr*, that four inquiries must be made of potential jurors in a criminal case that " 'go[ ] to the heart of a particular bias or prejudice which would deprive [a] defendant of his

right to a fair and impartial jury.' " *People v. Zehr*, 103 Ill. 2d 472, 477 (1984) (quoting *People v. Zehr*, 110 Ill. App. 3d 458, 461 (1982)). Rule 431(b) in effect at the time of Roman's trial provided as follows:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 41 After Roman's trial, Rule 431(b) was amended, in relevant part, to provide as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts *** that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." Ill. S. Ct. R. 431(b)(4) (eff. July 1, 2012).

¶ 42 In addressing the entire panel of potential jurors, the trial judge explained all four *Zehr* principles and asked if anyone had a problem with them. No hands were raised. When addressing the prospective jurors individually, the trial judge asked them essentially the same question regarding the fourth *Zehr* principle in a manner closer to the 2012 language: "You will not hold it against either of them should they choose not to testify?" Two prospective jurors, who were seated on the jury answered "No," while two others who were chosen as alternate jurors answered "Yes" and "Right." Roman argues that both "no" and "yes" cannot be appropriate answers to the same question and this supports his assertion that a biased juror sat on his jury. Despite his failure to raise the issue earlier, he requests that we review the issue for plain error because it affected the fairness of his trial. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (plain error rule applies when a clear and obvious error occurred and the evidence is so closely balanced that the error threatened to tip the scales of justice against defendant or the error is so serious that it affected the fairness of the defendant's trial). We disagree.

¶ 43 Although prospective jurors gave different answers to the same question, this highlights a problem with the language of Rule 431(b) and is no evidence of bias. To suggest that by answering no, the juror who was seated on the jury was informing the court she would hold it against Roman if he did not testify and that defense counsel did not immediately object defies credulity. A more reasonable explanation is that the double negative language in the rule caused confusion for the potential jurors, who were trying to inform the trial judge that they would not hold it against Roman if he failed to testify, but answered the question both in the affirmative and the negative.

¶ 44 Also, while the presence of a double negative in the transcript raises an ambiguity, often in informal speech what is referred to as double negatives are used without causing confusion or misunderstanding. The reason for this is that speakers are in a position to observe one another's tone of voice, gestures, facial expression, and other oral/visual characteristics, as in this case.

¶ 45 Legal grammarian and author of the leading books on legal writing, Bryan Garner, in A Dictionary of Modern Legal Usage 584 (2d ed. 1995), refers to a "negative upon negative" as "colliding negatives." He observes that lawyers have trouble "decoding" colliding negatives; a supreme court rule should be written to avoid the need of anyone resorting to "decoding."

¶ 46 Removal of the language regarding a defendant's "failure to testify" improved the Rule but in the process the drafters created colliding negative language that can confound the record. An amendment would reduce the likelihood of juror confusion in the future by eliminating the colliding negative. It also should provide clarity to reviewing courts that are asked to determine whether a trial court has complied with the rule.

¶ 47 Given our determination that Roman's conviction must be reversed due to the admission of irrelevant and prejudicial gang evidence, we need not address the other issues raised by him on appeal.

¶ 48 CONCLUSION

¶ 49 For the reasons set forth above, we reverse Roman's conviction and remand his cause for a new trial, as provided in this decision.

¶ 50 Reversed and remanded.