2023 IL App (1st) 200011-U

FIRST DISTRICT,
FIRST DIVISION
February 27, 2023

No. 1-20-0011

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 17 CR 1981 |
| | ) | |
| LORENZO PARISH, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Hyman specially concurred.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence for two counts of first degree murder is affirmed where he was proven guilty beyond a reasonable doubt, the trial court did not abuse its discretion in making various evidentiary rulings, and defendant's mandatory life sentence did not violate the proportionate penalties clause of the Illinois Constitution.

¶ 2    Following a jury trial, defendant Lorenzo Parish was convicted of the first degree murders of Chiquita Ford and Bryant Fields and sentenced to a term of natural life imprisonment. On appeal, defendant argues that: (1) he was not proven guilty beyond a reasonable doubt, (2) the trial court erred in excluding a Facebook video of Fields being shot by an unidentified individual months before his murder, (3) the trial court erred in admitting a photograph of defendant

displaying a tattoo and the testimony of defendant's probation officer, and (4) imposing a mandatory life sentence violated the proportionate penalties clause of the Illinois Constitution. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Defendant was charged with the first degree murders of Chiquita Ford and Bryant Fields and of personally discharging a firearm that proximately caused their deaths.

¶ 5                                  Pre-Trial Motions

¶ 6        Prior to trial, defense counsel orally moved to admit a Facebook video showing Fields being shot approximately seven months prior to his murder as evidence "that there were other people that had motives to do this crime." Counsel acknowledged that no one was charged in connection with the other shooting. The trial judge held that this evidence was irrelevant because there was no "nexus between that shooting and what happened in this situation."

¶ 7        The State moved *in limine* to illicit testimony that defendant was on probation at the time of the offenses and missed meetings with his probation officer after the offenses had occurred. The State argued that defendant's failure to appear showed consciousness of guilt. The court ruled that the evidence would not be admitted unless the State was able to establish that defendant knew his appearance "on a particular date" was required.

¶ 8        The State also sought admission of a Facebook photograph of defendant that Mitchell showed to the police during the investigation. Mitchell told the police she had known defendant since 2004 by the nickname "Little Zo" and that he had a tattoo on his left hand, which was depicted in the photo. The tattoo had a Warner Brothers "WB" logo, which the State acknowledged stood for "Winchester Boys," a street gang. The trial court found the photograph corroborated the description of defendant that Mitchell gave to the police.

¶ 9                                     Jury Trial

¶ 10 Mitchell testified that on October 28, 2016, she met up with Fields and Ford at a gas station at 54th Street and Damen to purchase marijuana. Fields was Mitchell's cousin and Ford was a longtime friend. When the shooting began, Mitchell was seated in the back seat of Ford's white two-door vehicle, Ford was in the driver's seat, and Fields was in the passenger seat with a pizza box on his lap and a gun underneath. As she bent down to pick up two bags of marijuana from the floor, Mitchell heard gunshots coming from the passenger side of the vehicle. She looked up and saw that defendant, known to her as "Little Zo," was "firing the shots." Defendant was wearing a grey Nike hoodie "halfway up," but nothing was blocking his face. Mitchell also recognized the "WB" tattoo on his left hand.

¶ 11 Defendant ran away after the shooting. An individual named Darryl approached the vehicle, grabbed the gun that had been on Fields's lap, and took off running after him. Mitchell called the police and the mothers of the victims.

¶ 12 When the police arrived, Mitchell tried to tell an officer that she had been in the vehicle but was told to "just be quiet." She left the gas station without giving the police her name, address, phone number, or any other information because she "didn't want everybody in the neighborhood knowing that [she] was gonna [*sic*] tell [the police] that [she] saw what happened." When she went to use the bathroom across the street from the gas station, she discovered that her left buttock had been grazed by a bullet. On November 10, 2016, Mitchell identified defendant in a photo array as the shooter.

¶ 13 The autopsy reports established that Ford was shot twice, including a fatal gunshot wound through the right arm into the torso, and Fields sustained multiple gunshot wounds. The manner of death for both victims was homicide.

¶ 14 Chicago Police Forensic Investigator Brian Smith recovered two spent bullets and metal fragments from the interior of Ford's vehicle, and eight spent cartridge casings from the ground

outside the vehicle. Subsequent testing confirmed that all eight cartridge casings were fired from the same firearm.

¶ 15    The gas station surveillance video was admitted into evidence. Mitchell testified that the video showed her getting into the back seat of Ford's white vehicle at the gas station. A few minutes later, Ford moved the vehicle and got out to pump gas. Shortly after Ford returned to her vehicle, defendant approached on the passenger side and started shooting. Defendant fired multiple shots into the vehicle and ran away. Darryl approached and grabbed a gun through the passenger's window and ran after defendant. Mitchell got out of the vehicle and went into the gas station.

¶ 16    Outside the presence of the jury, the parties discussed the testimony of defendant's probation officer, Kristen Falese. The court indicated that the evidence was "admissible with regard to consciousness of guilt," but "[a]nything that occurred before the crime itself is not going to be admitted."

¶ 17    In a formal offer of proof, Falese testified that she was defendant's probation officer but only met with him in person once, on September 27, 2016, in Bridgeview. Defendant canceled scheduled meetings on October 6, 2016, October 11, 2016, October 19, 2016, and October 27, 2016. Despite being warned a violation of probation petition would be filed if he did not appear on November 1st, defendant still failed to appear. Falese left defendant a voicemail message about making a "home field visit" on November 7, 2016. Defendant "wasn't there" when Falese arrived for the home visit. She scheduled "one last appointment" with defendant on November 21, 2016. Defendant failed to appear again, claiming that "he didn't have any transportation *** or money" to get to Bridgeview. Falese told defendant that he was required to appear at the November 30, 2016, violation of probation hearing.

¶ 18    Defense counsel argued that Falese's testimony constituted proof of other crimes, was more prejudicial than probative, and that defendant's flight could be established by other evidence (*i.e.*,

that he was subsequently arrested in another state). The trial court ruled that Falese's testimony would be allowed, but prohibited the State from eliciting the fact that Falese was a probation officer, that defendant was on probation, or that defendant had violated his probation.

¶ 19    Before the jury, Falese testified that she was a "Cook County employee" and that her job responsibilities included meeting "with individuals." Falese personally met with defendant at her Bridgeview office on September 27, 2016. Defendant missed scheduled meetings on October 6th, October 19th, October 27th, November 1st, November 7th, and November 21st. In various telephone conversations, defendant told Falese that he missed the meetings because he did not have transportation. Although it was "possible" to get from defendant's home to Bridgeview, Falese acknowledged it took a "significant amount of time." On November 7th, Falese informed defendant that he would have to appear before "a judge" if he missed their next meeting. Defendant failed to appear in court on November 30, 2016, and Falese had no further contact with him.

¶ 20    Chicago Police Detective Destry Wilbourn was at the scene of the shooting on October 28, 2016, but did not meet with Mitchell until November 10, 2016. At the police station, Mitchell identified defendant in a photo array as the shooter, noting that "he had a very distinctive tattoo on his hand." Defendant was arrested in Texas in January, 2017.

¶ 21    The jury found defendant guilty of the first degree murder of Fields and Ford, and of personally discharging a firearm that proximately caused their deaths.

¶ 22    Several Chicago Police officers testified in aggravation at defendant's sentencing hearing. Officer Olmeda arrested defendant in 2010 after defendant threatened a teacher at school. Officer Mellett arrested defendant in June 2011 for pointing a gun at a 14-year-old girl who was a witness in an ongoing investigation. Detective Marley arrested defendant in October 2011 for shooting two individuals. When the victims "refused to ultimately *** go forward" defendant was adjudicated delinquent for unlawful use of a weapon. Officer Eigenbauer arrested defendant in May 2012 for

possessing a semiautomatic gun and extended magazine and defendant was adjudicated delinquent for unlawful use of a weapon. Officer Ignacio Alvarado testified that defendant was arrested in June 2013 for shooting at one of the same victims of the October 2011 shooting.

¶ 23 Additionally, Cook County Department of Corrections Lieutenant Christine Guzman testified that defendant was found guilty before the disciplinary hearing board for beating another detainee on April 5, 2018. The victim impact statement of Fields's mother was also introduced.

¶ 24 Defendant's presentence investigation report ("PSI") detailed delinquent adjudications in 2011 for aggravated assault with a deadly weapon and 2012 for unlawful use of a weapon and two misdemeanor convictions in 2015 and 2019 for battery. At the time he committed this crime, defendant was on felony probation for resisting arrest in 2016.

¶ 25 In mitigation, Dr. James Garbarino testified as an expert in developmental psychology. Garbarino described his role as an "educational witness," meaning he did not "do an individual assessment" of defendant or interview his family. He stated that scientific research shows that "human brain maturation typically doesn't really occur until mid-20s, 25 or 26" and that "there was no scientific reason to set a bright line cutoff at 18." Garbarino explained "the evolution of developmental science since *Roper* and *Miller*," ultimately concluding that "there's movement generally to move the *Roper* protections *** upward from 18." This movement is based on considerations including potential for rehabilitation, lack of fully developed executive functioning skills, inability to manage emotions, delays in maturity caused by adversity and trauma, and impulsivity.

¶ 26 With respect to defendant specifically, Garbarino stated that based on his "social history *** at some point in late childhood/early adolescence, he was in one of these toxic, violent neighborhoods. He was shot, I think when he was 15. His best friend was murdered. He naturally walked into gang participation." Garbarino acknowledged that the social history he reviewed was

provided by the defendant. He also noted that defendant had scored a three on the "Adverse Childhood Experience" ("ACE") test, which is ten-point scale designed "as a way of capturing some of the dimensions of adversity that affect children's development." Garbarino explained that "a score of 3 is worse than about 70 or 80 percent of the general population, but it doesn't put you in that highest category that many murderers find themselves." In Garbarino's opinion, defendant could "probably" be rehabilitated.

¶ 27    Defendant was sentenced to a mandatory term of natural life imprisonment for the first degree murders of Fields and Ford.[1] Even though defendant was not a juvenile when he committed these crimes, the court still considered "the *Miller* factors" and the proportionate penalties clause of the Illinois Constitution before imposing sentence.

¶ 28    Regarding the statutory factors in aggravation and mitigation, the court found that defendant's conduct caused or threatened serious harm, he had a history of prior delinquent and criminal activity, the sentence was necessary to deter others, and defendant was on probation when he committed the offense. The court also found that defendant's conduct was not reckless, facilitated by another, or provoked, and "this criminal behavior is not a sole incident *** it does appear to show a pattern."

¶ 29    Concerning the *Miller* factors, the court considered the defendant's age, maturity, familial and peer pressure, ability to deal with police officers and attorneys, and his prospect for rehabilitation. The court concluded that "defendant is more like an adult than a child," he was "a fairly bright student," and there is no indication he could not consider the risks or consequences of his actions. Despite defendant's "less than *** desirable upbringing," the court found no evidence

---

[1] The record reflects that the trial court stated the sentence was mandatory pursuant to 730 ILCS 5/5-8-1(a)(1)(c)(i). We believe this was an inadvertent mistake, as section (c)(i) requires that defendant "has previously been convicted of first degree murder," and was therefore not applicable to defendant. The statutory section applicable in this case is 730 ILCS 5/5-8-1(a)(1)(c)(ii), which mandates a natural life sentence for murdering more than one person.

of physical abuse or other childhood trauma. Regarding defendant's potential for rehabilitation, the court acknowledged "some information *** that he apparently is a changed person since this happened," but could not "ignore the fact that the defendant apparently assaulted another person while in Cook County Jail over that person's commissary money."

¶ 30     The court did not "discount Dr. Garbarino's expertise," but was troubled by the lack of any physical evidence specific to defendant, such as MRI or CT scans, suggesting that defendant's brain development was delayed. The court concluded that a mandatory natural life sentence was just in view of "the crime committed and also for society."

¶ 31                                    ANALYSIS

¶ 32                            Sufficiency of the Evidence

¶ 33     Defendant argues that the evidence was insufficient because Brande Mitchell's testimony was not credible. In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 34     To prove defendant guilty of first degree murder, the State was required to establish that, without lawful justification, he intentionally or knowingly shot and killed Chiquita Ford and Bryant Fields while armed with a firearm, and that he personally discharged the firearm which proximately caused their deaths. 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 35        Mitchell's eyewitness testimony was corroborated by the gas station surveillance video. In addition, defendant does not dispute that he was arrested in Texas approximately two months after the shooting or that flight can raise the inference of guilt. *People v. Lewis*, 165 Ill. 2d 305, 349 (1995). When viewed in the light most favorable to the State, the evidence was sufficient for a reasonable jury to find that defendant murdered Ford and Fields beyond a reasonable doubt.

¶ 36        Defendant also challenges the reliability of Mitchell's identification testimony. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

¶ 37        Mitchell testified that she clearly saw the defendant, known to her as "Little Zo," standing next to the passenger side door of the vehicle. Mitchell's identification is "strengthened to the extent of the prior acquaintance." See *People v. Jones*, 187 Ill. App. 3d 823, 831 (1989). The surveillance video corroborates Mitchell's testimony that defendant's sweatshirt hood was not blocking his face at the time of the shooting. The record establishes that Mitchell's degree of attention was more than adequate to recognize defendant's face and hand tattoo.

¶ 38        Mitchell did not initially speak to the police at the gas station because one of the officers told her to "just be quiet." She did not wait around because she "didn't want everybody in the neighborhood knowing that [she] was gonna [*sic*] tell [the police] that [she] saw what happened." On November 10, 2016, she positively identified defendant as the shooter at the police station and never wavered in her identification. On the whole, the *Biggers* factors weigh in favor of the reliability of Mitchell's identification of defendant as the offender. See *Jackson*, 443 U.S. at 319.

¶ 39    In challenging the reliability of Mitchell's identification, defendant relies on *People v. Johnson*, 2021 IL App (1st) 171885. Unlike in *Johnson*, Mitchell's testimony in this case was not impeached by other undisputed evidence. Mitchell plausibly explained why she did not identify defendant at the scene, and we do not find her testimony to be "contrary to the laws of nature or universal human experience." *Id.* ¶ 78. Viewed in the light most favorable to the State, the evidence was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt.

¶ 40                                  Exclusion of Facebook Video

¶ 41    Defendant asserts that the trial court erred in not admitting a Facebook video recording showing that Fields was shot approximately seven months prior to his murder by someone who looked "significantly different" from defendant. The State argues that defendant forfeited this argument by not presenting a sufficiently specific offer of proof for admission at trial.

¶ 42    "A trial judge has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused." *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996). Evidence regarding a theory of an alternative suspect should be excluded as irrelevant "if its connection to the crime at issue is overly remote or speculative." *People v. Mayberry*, 2020 IL App (1st) 181806, ¶ 39 (citing *People v. Kirchner*, 194 Ill. 2d 502, 539-40(2000)).

¶ 43    When a trial court refuses to admit evidence, a formal offer of proof is necessary to preserve an appealable issue. *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 34. Our supreme court has noted that "The two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). In some instances, "an informal offer of proof consisting of counsel's summary of what the proposed evidence might

prove may be sufficient if specific and not based on speculation or conjecture." *People v. Roberson*, 401 Ill. App. 3d 758, 769 (2010). "Where it is not clear what a witness would say, or what his basis would be for saying it, the offer of proof must be considerably detailed and specific. A reviewing court can thereby know what was excluded and determine whether the exclusion was proper." *People v. Peeples*, 155 Ill. 2d 422, 457 (1993). The failure to make an adequate offer of proof forfeits the issue on appeal. *Roberson*, 401 Ill. App. 3d at 768-69.

¶ 44        Defense counsel's offer of proof in this case did not identify the names of any potential witnesses, their connection to the shooting, or the nature of what the offered testimony would reveal. Although defense counsel argued that the description of the March 31st shooter by an unknown source did not match defendant's description, no further summary of this proposed evidence was presented. Significantly, there was no evidence presented that the March 31st shooting was connected to the instant crime. As the trial judge pointed out, Fields could have been "shot twice by two different people." Moreover, the video at issue was not presented below and is not a part of the record on appeal.

¶ 45        Since the proposed evidence of defendant's alternative suspect theory was both remote and speculative, his offer of proof was insufficient to preserve this issue on appeal. Accordingly, we find no abuse of discretion in the trial court's exclusion of the Facebook video evidence.

¶ 46                              Admission of Evidence

¶ 47        Defendant argues that the trial court erred in admitting a Facebook photograph and the testimony of probation Officer Kristen Falese. The admissibility of evidence is a matter "within the sound discretion of a trial court, and a reviewing court will only reverse if there is an abuse of that discretion, *i.e.*, where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position of the trial court." *People v. Davila*, 2022 IL

App (1st) 190882, ¶ 48. Evidence is generally admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011).

¶ 48    Evidence is relevant when (1) it tends to prove a fact in controversy, or (2) it renders a matter in issue more or less probable. *Jones v. Rallos*, 384 Ill. App. 3d 73, 92 (2008). Relevant evidence is inadmissible only if the prejudicial effect of admitting it substantially outweighs any probative value. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010). "Prejudicial effect" in the context of the admission of evidence means that the evidence in question will cast a negative light upon a defendant for reasons that have nothing to do with the case on trial. *People v. Lynn*, 388. Ill. App. 3d 272, 278 (2009). In other words, the jury would be deciding the case "on an improper basis *** such as sympathy, hatred, contempt, or horror." *People v. Eyler*, 133 Ill. 2d 173, 218 (1989).

¶ 49                    *Facebook Photograph*

¶ 50    Defendant asserts that the Facebook photograph of him wearing a tilted hat and making a hand gesture was overly prejudicial. Although he argues that the photograph depicts him as a gang member, there was no evidence presented at trial that the shooting was gang related. On the contrary, nothing in the record suggests that the photograph was offered for any purpose other than corroborating Mitchell's identification of defendant.

¶ 51    A trial court should be cautious when admitting gang-related evidence because, "particularly in metropolitan areas, there may be strong prejudice against street gangs." *People v. Smith*, 141 Ill. 2d 40, 58 (1990). However, not every sign, mannerism, or clothing style that has been adopted by a street gang for its own use *automatically* constitutes gang evidence. For this reason, we allow gang experts to testify at trial regarding gang history, culture, attire, tattoos, and structure. Without context, it is not always readily apparent what the myriad of gang symbols represent. See, *e.g.*, *U.S. v. Robinson*, 978 F.2d 1554, 1564-65 (10th Cir. 1992) ("The average juror would fail to recognize the 'significance of this evidence without the particular background

knowledge' of gangs and the philosophy of gang membership." (quoting *U.S. v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991)).

¶ 52     Since Mitchell testified that she recognized defendant at the gas station, in part, because of the tattoo on his left hand, the trial court properly found that the photograph was relevant to the issue of identification. The court acknowledged that certain individuals involved in the criminal justice system "may or may not know some of the subtleties of this picture," but no witness was allowed to testify to those subtleties in this case.

¶ 53     In *People v. Roman*, 2013 IL App (1st) 110882,[2] we found that the trial court abused its discretion in admitting certain gang evidence, including photographs of the defendant's gang tattoos and testimony detailing his gang gestures and affilitation with gang members. *Id.* ¶¶ 16-17. Unlike in this case, witnesses in *Roman* testified to the meaning of the tattoos and gestures, and two eyewitnesses explicitly testified that they knew the defendant was a member of the Latin Kings street gang. *Id.* ¶¶ 12, 16-17, 28. Significantly, "none of the witnesses mentioned Roman's tattoos in their testimony or suggested the tattoos were an aid to identifying him as one of the perpetrators." *Id.* ¶ 29. In contrast, Mitchell specifically testified that defendant's tattoo was an aid to her in identifying him as the shooter.

¶ 54     There was no evidence introduced at trial that defendant was in a gang, involved in gang activity, or that the position of his hat or hand sign was gang related. Accordingly, defendant has not shown that he was unduly prejudiced by the admission of this photograph. We find that the admission of the Facebook photograph was not an abuse of discretion.

¶ 55     Moreover, even if we were to find that the evidence was erroneously admitted, the error would be harmless because there is no reasonable probability, considering the other evidence

_____

[2] Defendant also cites *People v. Watkins*, 2019 IL App (3d) 170069-U. We caution defendant that unpublished opinions filed under Supreme Court Rule 23 prior to January 1, 2021, may not be cited for persuasive purposes. Ill. Sup. Ct. R. 23(e)(1).

presented at trial, that the verdict would have been different absent the admission of the photograph. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 91. Mitchell's eyewitness testimony was corroborated by the gas station surveillance video and defendant's flight to Texas after the crime supported the inference of his guilt. The photograph cannot be considered vital to defendant's conviction and no reversible error occurred. *Id.* ¶ 93.

¶ 56                                  *Testimony of Officer Falese*

¶ 57        Defendant also challenges the trial court's admission of probation Officer Falese's testimony that defendant failed to attend scheduled meetings and a court date before and after the shooting. A defendant's absence at a court proceeding "is proper as evidence of flight" and "admissible to show consciousness of guilt." *People v. McDonald*, 227 Ill. App. 3d 92, 97 (1992). However, the probative value of this evidence must still be weighed against the prejudicial effect of disclosing the defendant's criminal history. See, *e.g.*, *People v. Montgomery*, 47 Ill. 2d 510, 514 (1971) (noting that the prejudicial effect of evidence of the defendant's prior conviction was "unmistakable.").

¶ 58        After considering Falese's proffered testimony, the trial court allowed her to testify about defendant's missed appointments. In doing so, the court admonished the State that: "You can have [Falese] testify that she is employed by Cook County, that she periodically meets with individual, that she was scheduled to meet with this particular defendant, Mr. Parish. I do not want it revealed that it was on a violation of probation, that he was convicted of this offense."

¶ 59        Defendant claims that "the jury was left with the impression that [he] was on some form of court supervision, whether it be probation or perhaps pretrial release." But as the trial court explained, there are many other reasons a person might meet with government employees and appear in court, for example: "[I]t could be for a paternity matter, it could be *** a witness matter." Pursuant to the court's instruction, Falese did not testify that she was involved in the criminal

justice system or that she was defendant's probation officer. The record does not support defendant's claim that he was unduly prejudiced by the admission of this evidence.

¶ 60 Furthermore, even if the trial court's admission of Falese's testimony was erroneous, we cannot say that the verdict would have been different absent the evidence and any error was therefore harmless. *Sangster*, 2014 IL App (1st) 113457, ¶ 91. Defense counsel cross-examined Falese regarding missed appointments before the shooting as well as defendant's explanation for his absences, and undisputed evidence established that defendant fled to Texas after the murder. Accordingly, we find that no reversible error occurred.

¶ 61           Sentencing

¶ 62 Finally, defendant argues that his sentence of natural life imprisonment is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 63 The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional." (Internal quotation marks omitted.) *People v. Rizzo*, 2016 IL 118599, ¶ 28. "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002). "With regard to the statute at issue, we have recognized that the legislature considered the possible rehabilitation of an offender who commits multiple murder[s], and the seriousness of that offense, in determining that a mandatory minimum

sentence of natural life imprisonment is appropriate for the offense of multiple murders." *Id*. The constitutionality of a statute is reviewed *de novo*. *People v. McCarty*, 223 Ill. 2d 109, 135 (2006).

¶ 64   Defendant raises an as-applied constitutional challenge, asserting that the mandatory sentencing provisions are unconstitutional as applied to the facts and circumstances of this case. See *People v. Thompson*, 2015 IL 118151, ¶¶ 36-37 ("By definition, an as-applied challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner"). A challenge under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Defendant argues that imposing a mandatory life sentence in this case was so cruel, degrading, or wholly disproportionate to the offense that it shocks the moral sense of the community. *Rizzo*, 2016 IL 118599, ¶ 37.

¶ 65   In sentencing the defendant, the trial court considered applicable statutory sentencing provisions, the testimony of Dr. Garbarino, the arguments of counsel, the statutory factors in aggravation and mitigation, the nature and seriousness of the offense, defendant's criminal history, and defendant's behavior in Cook County Jail. The record does not support defendant's claim that the trial judge "discounted all of Dr. Garbarino's testimony" or that it imposed "a never-before heard of requirement" that he present MRI or CT scans of his brain. Dr. Garbarino acknowledged that he did not complete an "individual assessment" of defendant or interview his family members. The court's comments at sentencing simply reflected the lack of any particularized evidence showing that defendant was functioning at a level younger than his actual age when he committed these crimes. See also *People v. Savage*, 2020 IL App (1st) 173135, ¶ 78 (a defendant should make allegations that there were issues particular to him at the time of his offense that rendered him functionally younger than his chronological age).

¶ 66 The record establishes that defendant, while on felony probation, approached a car parked at a neighborhood gas station and executed two individuals for no apparent reason. In rejecting defendant's proportionate penalties challenge, the trial court found that "defendant is more like an adult than a child" and that the evidence supporting his potential for rehabilitation was weak. Based on the record before us, the mandatory sentence imposed by the trial court does not violate the proportionate penalties clause.

¶ 67 CONCLUSION

¶ 68 For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 69 Affirmed.

¶ 70 JUSTICES PUCINSKI and HYMAN, specially concurring:

¶ 71 It was error for the court to allow the introduction of the Facebook picture of the defendant with his hat turned and flashing a gang sign, since the defendant was in court and the witness could have indicated that his hand tattoo is the one she saw. The picture was prejudicial in our urban environment where most people are aware of gang clothing choices and the existence of hand signals, but the error was harmless given the other more significant and reliable evidence.