2021 IL App (1st) 190437-U
Order filed: March 19, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-19-0437

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 17456 |
| | ) | |
| MIGUEL VAZQUEZ, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's convictions for first degree murder and aggravated battery are affirmed, where his assertions of reversible error are unfounded.

¶ 2     Defendant-appellant, Miguel Vazquez, appeals from his convictions for first degree murder and aggravated battery. For the following reasons, we affirm.[1]

¶ 3     At approximately 7:45 p.m. on June 21, 2013, four people were shot—one fatally— in front of a house located on the 2900 block of North Kilpatrick Avenue in Chicago, Illinois. In

_____

        1 In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

September 2013, defendant was charged in connection with the shooting via a 172-count indictment alleging he committed multiple counts of first degree murder, attempted murder, aggravated battery, and aggravated discharge of a firearm. Prior to a jury trial, all but a single count of first degree murder and three counts of aggravated battery were dismissed on the State's motion.

¶ 4     Also prior to trial, the State filed a written motion to admit gang evidence. In the motion, the State alleged that defendant was identified as the shooter by the three surviving victims and two eyewitnesses who were across the street at the time of the shooting. The motion also alleged that defendant was either a member of, or associated with, the Spanish Cobra street gang, while the victims were not gang-affiliated. At trial, the State would seek to admit evidence of a gang rivalry in the area of the shooting between the Spanish Cobra and Latin Brother street gangs, through a gang expert, Chicago Police Officer Ronnie Rodriguez. Notably, "the house that the Latin Brother gang members stayed at was two houses off the northeast corner in the 3000 block of North Kilpatrick, while the victim's home was two houses off the northeast corner of the 2900 block of North Kilpatrick." Both eyewitnesses located across the street had previously dated Latin Brother gang members, and they called the police after the shooting and both spoke with the police on that day.

¶ 5     In addition, the motion stated as follows:

"The next day after the shooting, the Defendant sees the two eyewitnesses in the park, and he calls them over and asks them who got shot, that he (Defendant) heard that it was some LBs (Latin Brothers). When one of the eyewitnesses informs the Defendant that it was not Latin Brothers that got shot, rather a random family, the Defendant tells the eyewitness to tell him where her boyfriend lives so that he (Defendant) can go shoot her boyfriend. The Defendant then makes a veiled threat at the other eyewitness. These threats and this

intimidation against these two eyewitnesses, as well as the gang evidence, should be admitted as it is clearly relevant and its probative value is not substantially outweighed by any prejudicial effect to the Defendant."

The motion asserted that this evidence was relevant to "provide a motive for an otherwise inexplicable act."

¶ 6 In a written response to the State's motion, defendant denied being the shooter, denied having any knowledge of the events alleged in the motion, and contended that the State's motion should be denied as it relied upon the conclusory statement that defendant was a member of the Spanish Cobra street gang.

¶ 7 At a hearing on the motion, the State further noted that the two eyewitnesses called the police immediately following the encounter with defendant the day after the shooting and then met with police officers two days later and identified defendant in a photo array. The three surviving victims subsequently also identified defendant as the shooter. The State also stated that while defendant had denied any membership, he had admitted that he "associates with the Spanish Cobras in the area." The State stressed that this evidence was important as "this is a critical part of the investigation. This is when the police identify the suspect in this case."

¶ 8 After noting that any credibility and weight of the evidence issues would be for the trier of fact to resolve, the trial court granted the State's motion after concluding that at least one of the eyewitnesses can "testify to statements made to her by the defendant probing the idea of whether the victims were members of a gang that was supposedly at war with or opposite to the Spanish Cobras" and that "defendant, subsequent to arrest, makes an admission to the police that he associated with the Spanish Cobras, though not actually a member of the Spanish Cobra gang."

¶ 9 The matter then proceeded to a jury trial held in February 2018. The State began by

presenting the testimony of the three surviving victims of the shooting: siblings Veronica, Uvaldo, and Marcos Blancas. The three consistently testified that at the time of the shooting Veronica and Uvaldo—but not Marcos—lived at their parents' house, located at 2903 North Kilpatrick in Chicago, Illinois. Also living in that home at the time of the shooting were: (1) Uvlado's wife, Marsiela, and his three young children, Octavio, Jose and Angelie, and (2) Rene Soto, a cousin from Mexico who had been living in the home for two or three months.

¶ 10    At approximately 7:45 p.m. on June 21, 2013, Veronica, Uvaldo, Marcos, Rene, Marsiela, Octavio, Jose and Angelie were all gathered on the front steps and in the front lawn of the home. It was still light out, and they were enjoying a summer evening while awaiting the arrival of a street-food vendor. The home was located on the east side of the street and was the second house north of the intersection of Kilpatrick and George Street.

¶ 11    At that time, the siblings heard gunshots and observed a man approaching from the yard of the house located immediately to the south on Kilpatrick. The man held a gun and fired 6-9 shots toward the group from 10-20 feet away. In a line-up presented separately to the siblings at a police station on August 12, 2013, and again in open court at trial, each of the siblings identified defendant as the shooter. As a result of the shooting, Rene suffered fatal injuries, Veronica was left blind in her left eye, Uvaldo is no longer able to walk, and Marcos can no longer lift heavy objects.

¶ 12    In addition, Veronica testified that, just prior to the shooting, she saw two girls walking south on the west side of Kilpatrick, just south of George. She recognized one of them as Bianca, who was a classmate at school but was not a friend. Veronica also testified that she had described defendant to the police as being a dark-skinned Puerto Rican male wearing a baseball hat and a t-shirt.

¶ 13    Both Uvaldo and Marcos acknowledged that they had been facing away from the shooter

when they heard the first shot, but both testified that they turned around when they heard that shot and observed defendant. Marcos had described the shooter to police as being a Hispanic male around the age of 20, wearing a baseball hat, t-shirt and blue pants. While he testified at trial that defendant held a dark gun, he acknowledged that he did not tell the police this detail at the time of the shooting because he was scared and nervous.

¶ 14    The State then presented the testimony of Bianca Munoz. She testified that she was 17 years old on June 21, 2013. At approximately 7:45 p.m. on that day, she was walking south with her friend, Jacqueline Miranda, along the west side of Kilpatrick. It was still light out at the time, as it was the first day of summer. She observed a "blueish" colored van driving north, and when the two had crossed south of George, she heard a screeching noise behind her.

¶ 15    Turning around toward the noise she observed the van parked facing north in an alley running north from George, behind the houses on the east side of Kilpatrick. She then saw the face of defendant, a man she had never seen before and whom she identified in open court, as he exited the rear, left-side door of the van and watched him "sneaking, walking kind of low" toward Kilpatrick with a gun in his hands. Defendant was wearing a black shirt, baseball hat, shorts, and black shoes. As he passed the first house, Bianca then saw defendant fire more than 5 shots toward a group of about 8 people, including 3 children, that were in the front of the second house north of George on the east side of Kilpatrick. Defendant then returned to the van and the van left the scene, driving north.

¶ 16    Bianca and Jacqueline ran toward the group of people, and Bianca realized that one of the victims was Veronica, with whom she had been a classmate but not a friend. Jacqueline called 911, and then Bianca and Jacqueline ran north to check on Bianca's boyfriend. As Bianca explained, she was concerned because the boyfriends of both Bianca and Jacqueline were members of the

Latin Brothers street gang. When they retuned to the scene of the shooting, Bianca spoke to the police.

¶ 17    The next day, Bianca and Jacqueline were in Kelvyn Park, located southeast of the location of the shooting and south of Diversey Avenue. There, they encountered defendant, who asked them if any "LBs," or Latin Brothers, had been shot. Bianca learned that defendant's nickname was "Preieto," and she also noticed the same van she observed the night before was parked nearby. After the encounter, Bianca and Jacqueline called the police. Two days later, Bianca identified defendant as the shooter in a photo array, and she also identified him as the shooter in a lineup on August 12, 2013.

¶ 18    The State then introduced the testimony of two Chicago police officers involved in the initial investigation of the shooting. The first officers to respond to the shooting arrived less than a minute after receiving a call of "person shot, shots fired" at 7:45 p.m. The preliminary report completed by those officers included a description of the shooter as being a male Hispanic, unknown hairstyle and complexion, 5'8" to 5'11" tall, 130 to 150 pounds, 20 to 29 years of age, wearing a red t-shirt and gray shorts. Six shell casings were recovered from the scene, which were located running north from the sidewalk on the corner of George and Kilpatrick. The closest was estimated to be located 20-25 feet from the front steps of 2903 North Kilpatrick, and the furthest was estimated to be located 40 to 50 feet away.

¶ 19    Chicago police officer Ronald Rodriguez, who was qualified as a gang expert, testified that, in 2013, the geographical boundaries of the territory of the Latin Brothers street gang—also known as the "LBs"—were between Belmont Avenue to the north and Diversey Avenue to the south, and between Lamon Avenue to the west and Kenton Avenue to the east. At the same time, the Spanish Cobras gang claimed the area south of Diversey Avenue in that area and had a presence

in Kelvyn Park, located south of Diversey Avenue. At the time, these two gangs were rivals and would fight each other.

¶ 20    FBI Special Agent Joseph Raschke testified as an expert in cell phone technology. Raschke conducted an historical cell site analysis for defendant's cell phone. As he explained, historical cell site analysis is used to make an "approximate determination as to a general area where a phone was" at a particular point in time. Raschke testified that phone companies keep track of cell tower locations, the number of sides on each tower, and the direction each side faces. When a record is generated, it will give the date and time of the call, which tower was being used, and the side of the tower that handled the traffic. According to Raschke, a cell phone maintains contact with the tower from which it receives the strongest, clearest signal, which is usually the network tower to which the phone is closest.

¶ 21    Raschke conducted an analysis of defendant's cell phone for June 21, 2013, between 7:20 p.m. and 8:45 p.m. There was a record of five calls to and from defendant's phone during this time, the first four of which took place at 7:40, 7:57, 8:07, and 8:12 p.m. The last call took place at 8:35 p.m. All five calls connected to the tower closest to 2903 North Kilpatrick, which was located a couple of blocks southeast of the shooting, a half a block north of Diversey Avenue. This cell phone tower had three facings: southeast, southwest, and north. The activated side of the tower for the first four calls pointed primarily southeast. Based on this, Raschke testified that at the time those calls took place, the phone was "likely in that direction from the tower," *i.e.*, to the southeast of the tower, "and closer to that tower than the other towers in the area." The last call connected to the same tower but activated the southwest side of the tower. According to Raschke, this data indicated the phone was in the same "general area" as when the first four calls were made or received but was in the direction of the other side of the tower.

¶ 22    Nevertheless, Raschke clarified that there is some overlap in the coverage of the tower facings, and it is therefore possible that defendant's phone was not exactly located in the direction of the activated facing. It was also possible that the phone did not move for the latter call but simply alternated to the other side of the tower. He also stressed that his analysis only indicated that defendant "was in that general area. I can't do anything to pinpoint an address where the phone was."

¶ 23    Chicago Police Detective Greg Swiderek testified that he was assigned to investigate this case on June 21, 2013, just before 8:00 p.m. He worked with his partner, Detective Mario Garcia. Swiderek processed the scene and spoke with Bianca, Jacqueline and Marisela.

¶ 24    The next day, Garcia received a voicemail from Jacqueline stating she wanted to talk to him. Another detective, Detective Morales, then met with Jacqueline and Bianca on June 24, 2013. As a target of the investigation following that conversation, the police "had a nickname of Prieto, a dark-skinned Puerto Rican, short, stocky, about 20 from the area of Kelvyn Park." The police connected the nickname to defendant and then compiled a photo array with defendant's photo in it. The detectives attempted to have Jacqueline look at the photo array but were unable to.

¶ 25    However, on July 22, 2013, Bianca viewed the photo array and identified defendant as the shooter. Defendant was arrested on August 12, 2013, next to Kelvyn Park. The detectives then interviewed defendant at the police station, and a portion of defendant's recorded interview was admitted into evidence and published to the jury. In the interview, the detectives begin by telling defendant that they are questioning him about a shooting that happened on June 21, 2013 at 2903 North Kilpatrick. Defendant admitted that he was previously a Spanish Cobra, but in a different neighborhood. Defendant admitted that Spanish Cobras are active in Kelvyn Park.

¶ 26    A lineup was then assembled that included defendant, and the lineup was viewed separately

by Bianca, Veronica, Marcos, Uvaldo and Marisela. All but Marisela identified defendant as the shooter, with Marisela being unable to make a positive identification.

¶ 27    The parties stipulated that if called to testify, Dr. Aerial Goldschmidt, an expert in forensic pathology, would testify that he performed a postmortem examination of Rene Soto. Dr. Goldschmidt would testify that Soto died from multiple gunshot wounds and the manner of death was homicide. The parties further stipulated that if called to testify, Tracy Konior, an expert in firearms identification, would testify that the six fired cartridge cases recovered from the scene were fired from the same weapon.

¶ 28    After the stipulations, the People rested their case. Defendant's motion for a directed verdict was denied.

¶ 29    The defense began by calling Rosalynn Hererra to testify. On the date of the shooting, she lived at 2824 North Kilpatrick Avenue, which was located on the west side of the street and approximately five or six houses south of George. Rosalynn was on her front porch when she heard gun shots. She grabbed her son, brought him inside, and then went back outside and looked north toward the area from which she heard gunshots. The shooting had stopped by that time.

¶ 30    Rosalynn testified that nothing blocked her view of the intersection of George and Kilpatrick. When she looked, she saw a man running to the alley north of George and east of Kilpatrick. Rosalynn observed that he was wearing a blue hoodie and stonewashed jeans. She described the individual as "light colored. Not dark." Rosalynn testified that she was "positive" that defendant was not the person she observed running from the scene. Rosalynn did not observe a vehicle in the alley.

¶ 31    On cross examination, Rosalynn testified that she did not tell the police what she saw because nobody came to her block to ask questions. She also admitted that she had refused to talk

to a State's Attorney investigator about this case prior to trial, and only told defense counsel this information one year before trial.

¶ 32    Dominique Santana testified that she was 20 years old in June 2013, and had had gone to high school with defendant. In the first half of 2013, she would see defendant almost every day as he was "almost like best friends" with her boyfriend Doel, who was a member of the Spanish Cobras. To Dominique's knowledge, defendant was not a member of that gang, although she acknowledged Kelvyn Park was an area where Spanish Cobras hung out and defendant was there "all the time." She also acknowledged that at the time, there was a conflict between the Spanish Cobras and the Latin Brothers. She never knew defendant to wear a baseball hat.

¶ 33    Dominique testified that defendant was at the apartment she shared with Doel and their daughter when she returned home from work on June 21, 2013 at around 5:15 p.m. The apartment was located at 2757 North Kostner Avenue, south of Diversey and near Kelvyn Park. Also present was Doel, his father, Confessor, Jr., Doel's brother, Confessor, III, and others. Defendant left briefly around 5:30 p.m. but was back by 6:30 p.m. and remained at her apartment until at least 8:30 p.m. when she went to bed.

¶ 34    She realized shortly after defendant was arrested that he was at her apartment when the shooting occurred and told defendant's mother this information in August or September of 2013. However, she never went to the police with this information and only talked to defense counsel about it a month before trial.

¶ 35    Confessor Pizarro, Jr. testified defendant went to grammar school and high school with his son, Doel. On June 21, 2013, he went to the apartment shared by Doel and Dominique around 11:15 a.m. Defendant came to the apartment around 3:15 p.m. Confessor left around 9:00 p.m. When he left, defendant was still there. Defendant left only once to pick up some rice, and he

returned at 6:20 p.m. He did not recall what defendant was wearing, but he never knew him to wear a baseball hat. The evening stood out to him because around 7:30 or 8:00 p.m., more than 15 police cars drove past with sirens blaring. The next day, Confessor learned about the shooting.

¶ 36 Confessor knew that the Latin Brothers and Spanish Cobras gangs were active in the area. Confessor knew Doel was a member of the Spanish Cobras, but when asked if defendant was, he responded: "Not that I know of." Doel and defendant were very close friends at the time, and defendant was considered a friend of Confessor's family.

¶ 37 Confessor found out that defendant was being charged with murder from defendant's mother on the day he was arrested. Confessor never went and spoke to the police or told them that defendant was with him at the time of the shooting, nor did he ever speak to the State's Attorney's office. When an investigator left contact information for him prior to trial, he did not contact the investigator. Confessor did tell many members of his family about defendant's alibi, and shortly after defendant was arrested he informed defendant's attorney about defendant's whereabouts at the time of the shooting.

¶ 38 The parties stipulated that Chicago Police Detective B. Reyes would testify that he interviewed Bianca on the night of the shooting and she said:

"She saw a blue or silver Caravan coming towards us. The van turned right on George. The van stopped in the alley. She looked back and saw a guy getting out of the sliding door behind the driver. The guy is wearing a baseball hat and T-shirt with dark pants. He is a male Hispanic in his late teens to early twenties. He starts walking along the building going towards Kilpatrick. He had his right arm at his side like he's holding something. He gets to the corner and turns to the right. When he gets in front of the first house, he raised both his arms in front of him and starts shooting at the people in front of the second house. The

guy shot about six to eight times."

¶ 39    After the stipulation, the defense rested.

¶ 40    Prior to rebuttal, the defense objected to Detective Swiderek's proposed testimony, which was to include among other statements defendant's statement that his uncle, a ranking member of the Latin Brothers, called defendant on the day of the shooting and asked if his guys were responsible for the shooting. The defense objected that the video and this statement in particular was not rebuttal, amounted to hearsay, and included prejudicial gang evidence. Defendant also reiterated his "running objection" to the introduction of any gang evidence whatsoever. The court allowed the evidence over the defense's objection.

¶ 41    In rebuttal, the State first called State's Attorney's office Investigator Rosendo Suarez Del Real. The investigator received an assignment on the third and last day of trial to photograph 2824 North Kilpatrick Avenue. When he stood on the steps of 2824 North Kilpatrick, he could not see the alley to the east of Kilpatrick and north of George. Photographs taken that morning and supportive of his testimony were admitted into evidence and published to the jury. In addition, Del Real testified that 2824 North Kilpatrick is the twelfth house south of George on the west side of the street. When Del Real stood on the steps of 2824 North Kilpatrick and looked north toward the intersection of Kilpatrick and George where his partner was standing, he could not make out any distinguishing features.

¶ 42    Detective Swiderek was recalled to testify in rebuttal. He interviewed defendant four times after he was placed in custody and each was recorded. Defendant never gave a party at Dominique's apartment as an alibi, nor did he provide any names of possible alibi witnesses. Rather, Swiderek testified that defendant responded to questioning by stating:

    "He first began to tell myself and my partners that when the shooting occurred, he

was at work. That he worked Monday, Tuesday, Wednesday from 9:00 p.m. to 5:00 p.m. He then said he was at work -- he worked Monday through Fridays from 3:00 p.m. to 8:00 p.m. He finally said that he was on the Diversey bus at Kilpatrick. He saw a police Tahoe type vehicle, marked police vehicle, blocking the street, that the shooting had just occurred, that he had received a phone call from a high ranking Latin brother gang member who he claimed to be his uncle who asked him " 'did your guys do it?' "

¶ 43    A video of a portion of defendant's interview with police was then played for the jury. Of relevance here, in addition to the content outlined by Swiderek in the above quote, that video also included: (1) an assertion that defendant had been walking with a Spanish Cobra two weeks prior, an assertion defendant admitted was true, (2) an assertion that defendant was "a Cobra," to which defendant responded that he used to be but no longer was, (3) further questioning and assertions that defendant was "a Cobra," to which defendant admitted that he had "ties to the Cobras," including cousins and friends, (4) an assertion that defendant escorted two "shorty Cobras" to an "all-Cobra house," to which defendant denied that any Spanish Cobras were living in the house, and (5) a hypothetical, rhetorical question in which Swiderek asked if he—Swiderek—were a Latin Brother, would he shoot at defendant, to which defendant responded: Maybe you would."

¶ 44    The State rested in rebuttal, and the parties presented closing arguments. Thereafter, the jury found defendant guilty of one count of first degree murder and three counts of aggravated battery. The jury also found that defendant personally discharged a firearm that proximately caused death.

¶ 45    Defendant's motion for a new trial was denied, and he was subsequently sentenced to a total of 70-years' imprisonment, comprised of a 50-year sentence for murder, two consecutive 10 year sentences for aggravated battery and one concurrent sentence of 10 years for aggravated

battery. Defendant has now appealed.

¶ 46    On appeal, defendant first contends that the trial court erred by allowing the State to introduce irrelevant, highly prejudicial gang evidence at trial.

¶ 47    Relevant evidence is "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991). Our supreme court has held that "any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased." *People v. Smith*, 141 Ill. 2d 40, 56 (1990). More specifically, "[i]t is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. *Id.* at 58. For such gang evidence to be competent, "it must tend to establish the existence of the motive at least to a 'slight degree.' " *People v. Johnson*, 218 Ill. App. 3d 967, 987 (1991) (quoting *Smith*, 141 Ill. 2d at 58).

¶ 48    However, evidence that a defendant belongs to a gang must be admitted with care, because society regards gangs with "considerable disfavor." *People v. Morales*, 2012 IL App (1st) 101911, ¶ 40. While a defendant may not insulate the trier of fact from evidence of gang membership when it is relevant to a determination of an issue in the case (*People v. Rivera*, 145 Ill. App. 3d 609, 618 (1986)), evidence of gang membership "is admissible only when there is sufficient proof that the membership is related to the crime charged" (*People v. Villarreal*, 198 Ill. 2d 209, 232 (2001)). If the State establishes a relationship between gang membership and an offense, it must also show that membership is "relevant to an issue in dispute" and "its probative value is not substantially outweighed by its prejudicial effect." *Id.*

¶ 49    The trial court has discretion to weigh the probative value and prejudicial effect of gang evidence to determine whether it should be admitted in any given case. *Gonzalez*, 142 Ill. 2d at 489. To ensure a careful exercise of discretion, a trial court should require the State to demonstrate a clear connection between the crime charged and the gang evidence. *People v. Roman*, 2013 IL App (1st) 110882, ¶ 25. A trial court's evidentiary rulings regarding gang-related evidence are reviewed for an abuse of discretion (*Villarrea*l, 198 Ill. 2d at 232). An abuse of discretion occurs only when the trial court's decision is so arbitrary, fanciful or unreasonable that no reasonable person would agree with it. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 34.

¶ 50    With respect to defendant's gang membership, the State's gang expert testified that the Spanish Cobras gang claimed the area south of Diversey Avenue near its intersection with Kilpatrick and had a specific presence in Kelvyn Park. Both Dominique and Confessor testified that defendant was best friends with Doel, who was a Spanish Cobra. Dominique also testified that Spanish Cobras were located in Kelvyn Park, and that defendant would hang out there "all the time." While Confessor was not aware if defendant was a gang member, he did admit that he knew some friends of defendant and Doel were gang members and that it was possible that some of Doel's friends could also be members without him knowing. Bianca testified that defendant was in Kelvyn Park the day after the shooting.

¶ 51    The State also presented evidence that defendant himself admitted: (1) having previously been a member of the Spanish Cobras in another neighborhood, (2) having "ties" to the Spanish Cobras, including cousins and friends in the gang, and (3) that Kelvyn Park was an area where he would often hang out and an area where Spanish Cobras were located. Kelvyn Park was located directly across the street when defendant was arrested.

¶ 52    As to the connection between the evidence of defendant's membership in the Spanish

Cobras and the shooting, the State's expert testified that the location of the shooting was in an area claimed by the Latin Brothers, a gang with which the Spanish Cobras had a violent rivalry. Both Dominique and Confessor confirmed this testimony, and Confessor further testified that gang shootings were common in the neighborhood. Bianca testified that she ran to check on her boyfriend after the shooting because, as a member of the Latin Brothers, she thought he could be in danger. The following day, defendant himself asked if the victims of the shooting were Latin Brothers. Defendant was identified as the shooter by four people, and the van used in the shooting was observed nearby when Bianca saw defendant the following day in Kelvyn Park.

¶ 53    As to the relevance of the gang evidence, we reiterate that evidence is relevant if it has *any tendency* to "make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" (*Gonzalez*, 142 Ill. 2d at 487-88, "evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to *** provide a motive for an otherwise inexplicable act (*Smith*, 141 Ill. 2d at 58), and for such gang evidence to be competent, it must tend to establish the existence of the motive only to a " 'slight degree.' " *Johnson*, 218 Ill. App. 3d at 987 (quoting *Smith*, 141 Ill. 2d at 58). Here, it was the State's theory that this senseless and otherwise inexplicable shooting was the result of defendant mistaking the victims—non-gang members that happened to live in an area claimed by the Latin Brothers—for members of a rival gang.

¶ 54    Ultimately, it was within the trial court's discretion to determine if the gang evidence in this case met the standards outlined above and to weigh the probative value and prejudicial effect of the gang evidence to determine whether it should be admitted. *Gonzalez*, 142 Ill. 2d at 489. Considering this record, we cannot say that the trial court's decision to admit the evidence was so arbitrary, fanciful or unreasonable that no reasonable person would agree with it. *People v. Colon*,

2018 IL App (1st) 160120, ¶ 34.

¶ 55     In so ruling, we reject defendant's reliance upon the decision in *People v. Roman*, 2013 IL App (1st) 110882, ¶ 30-31. There, the appellate court found that gang evidence was not properly introduced to establish a motive for an otherwise inexplicable act where the State "did not present any evidence at trial to support this theory of the case" and "in the absence of any evidence that the crime was gangrelated [*sic*] and given the highly prejudicial nature of gang evidence, the trial court erred in finding it was admissible to support the State's theory of the case." *Id*. As discussed above, here the State presented a considerable amount of evidence to support its contention that this otherwise inexplicable shooting was the result of defendant mistaking the victims for members of a rival gang, and we cannot say that the trial court abused its discretion in admitting that evidence.

¶ 56     In addition, the *Roman* decision was also based in part on the trial court's failure to provide the jury with an "instruction informing them of the limited purpose for admitting the gang evidence that might ameliorate the prejudicial effect of that evidence. *Id*., ¶ 33. In contrast, here the trial court provided the jury with a limiting instruction informing them that any evidence that defendant was involved in conduct other than that charged should only be considered with respect to the issue of defendant's motive, pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved October 17, 2014).

¶ 57     Defendant next contends that the trial court erred by allowing the State to introduce certain portions of his recorded interview with police as rebuttal evidence, where those portions contained irrelevant and prejudicial gang evidence, some of which came in the form of inadmissible hearsay.

¶ 58     Rebuttal testimony is "that which is adduced by the prosecution to explain, repel, contradict, or disprove evidence presented by the accused." *People v. Rios*, 145 Ill. App. 3d 571,

584 (1986). However, it may be used only to rebut the defendant's evidence as to material matters, not collateral or irrelevant ones. *People v. Williams*, 96 Ill. App. 3d 958, 964 (1981). While it is generally inadmissible when presented in response to testimony elicited on cross-examination, rebuttal evidence is admissible if the cross-examination related to a specific, relevant issue or the rebuttal evidence discredits the witness in some respect. *People v. Rudi*, 94 Ill. App. 3d 856, 860 (1981). Whether to admit rebuttal testimony is a matter within the sound discretion of the trial court and its decision in this respect will not be overturned unless it has abused its discretion. See *People v. Woods*, 2011 IL App (1st) 091959, ¶ 26.

¶ 59    We begin by noting that, to the extent that defendant's challenge to the State's rebuttal evidence relies upon his general contention that gang evidence should not have been admitted at trial because such evidence was irrelevant, collateral and highly prejudicial, we reject that argument for the same reasons discussed above. The trial court did not abuse its discretion in finding the gang evidence relevant and material in this case.

¶ 60    Relatedly, we reject defendant's contention that rebuttal evidence as to his gang membership was improper where it was only during its own cross-examination of defendant's witnesses that t*he State* elicited testimony regarding defendant's gang membership. Because we conclude that the trial court did not abuse its discretion in finding gang evidence relevant and admissible in the first instance, we also conclude that the trial court likewise did not abuse its discretion in allowing rebuttal evidence to be presented in response to testimony elicited on cross-examination regarding that specific, relevant issue. *Rudi*, 94 Ill. App. 3d at 860.

¶ 61    Lastly, we reject defendant's contention that the trial court improperly allowed the State to introduce hearsay evidence in rebuttal. On appeal, defendant specifically contends that portions of the recorded interview were improper because they "consisted primarily of hearsay assertions from

Detective Swiderek concerning Defendant's alleged membership in the Spanish Cobras."

¶ 62    However, defendant's argument ignores a line of authority holding that it is "well established that a taped conversation or recording, which is otherwise competent, material and relevant, is admissible so long as it is authenticated and shown to be reliable through proper foundation," and that a "taped conversation is not considered hearsay; instead, it is treated as a mechanical eavesdropper with an identity of its own, separate and apart from the voices recorded." *People v. Griffin*, 375 Ill. App. 3d 564, 570–71 (2007); *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33 (same); *People v. Hughes*, 2013 IL App (1st) 110237, ¶ 65, *aff'd in part, rev'd in part,* 2015 IL 117242, ¶ 65 (same).

¶ 63    Furthermore, hearsay is not involved where a challenged statement "is admissible not for its truth, but for its effect on the listener." *People v. Britz*, 112 Ill. 2d 314, 320 (1986). As such, "statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response." *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35; *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48 (same); *Theis*, 2011 IL App (2d) 091080, ¶ 33 (same). Having reviewed the portions of the video challenged by defendant, we find that the trial court did not abuse its discretion in admitting them pursuant to this authority.

¶ 64    Before addressing defendant's next assertion of error, we pause to note that each of the above two arguments essentially resolve to a single, overarching contention: *i.e.*, that defendant was prejudiced by the introduction of gang evidence at trial. However, even if we accepted defendant's claim that gang evidence was improperly admitted, that does not necessarily mean that his convictions must be reversed.

¶ 65    " 'The erroneous admission at trial of * * * gang evidence does not automatically warrant

reversal.' [Citation.] This error 'is harmless where the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction.' [Citation.] 'The effect of inflammatory evidence depends upon the circumstances of the case.' " *Roman*, 2013 IL App (1st) 110882, ¶ 36.

¶ 66    It is axiomatic that the testimony of a single eyewitness, if positive and credible, is sufficient to sustain a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Here, the State presented evidence that *four* witnesses positively and consistently identified defendant as the shooter in both a line up and in open court, with Bianca having also previously identified defendant as the shooter in a photo array.

¶ 67    In addition, the testimony of Rosalynn—that she observed someone other than defendant running from the scene of the shooting—was significantly undermined by: (1) her own testimony that she immediately ran inside her house when she heard gunfire, and it was not until after the shooting stopped that she returned outside to look toward the shooting, and (2) Investigator Del Real's testimony that her house was not 5 or 6 houses south of George, but rather 12 houses south, one could not see the alley to the east of Kilpatrick and north of George from Rosalynn's house, and he could not make out any distinguishing features of his partner from Rosalynn's house when his partner was standing at the corner of Kilpatrick and George.

¶ 68    In addition, the alibi defense defendant presented at trial was significantly undermined by evidence that: (1) this alibi was never offered by defendant when he was arrested, (2) the alibi was inconsistent with the information defendant actually did tell police at the time of his arrest, and (3) neither Dominque nor Confessor ever provided any information supportive of defendant's alibi defense to the police or the State's Attorney prior to trial, despite having been provided the opportunity to do so.

¶ 69    Finally, we reject defendant's contention that the cell phone evidence was more supportive of his alibi defense than the State's theory of the case. It is certainly true that none of the 5 recorded calls from or to defendant's cell phone around the time of the shooting activated the north side of the cell tower, the direction of the shooting relative to the tower. However, none of the recorded calls took place at the exact time of the shooting either, with the first occurring 5 minutes before and the second occurring 12 minutes after.

¶ 70    Moreover, we acknowledge that most of the calls activated the southeast side of the tower, which Agent Raschke testified indicated that at the time those calls took place, the phone was "likely in that direction from the tower," *i.e.*, to the southeast of the tower, "and closer to that tower than the other towers in the area." We also acknowledge that the location of defendant's alibi, the apartment shared by Doel and Dominique, was located to the southeast of the tower. However, Agent Raschke specifically clarified that his analysis only indicated that defendant "was in that general area. I can't do anything to pinpoint an address where the phone was." Moreover, there is one other relevant area that is also located southeast of the cell tower, one which the evidence at trial indicated defendant visited "all the time": Kelvyn Park.

¶ 71    Considering this evidence, we conclude that any the introduction of any possibly improper gang evidence did not contribute to defendant's conviction.

¶ 72    Next, defendant contends that his defense counsel provided ineffective assistance by eliciting inadmissible, prejudicial hearsay testimony.

¶ 73    A claim of ineffective assistance of counsel is judged according to the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). See *People v. Lawton,* 212 Ill. 2d 285, 302 (2004). In order to obtain relief under *Strickland,* a defendant must prove defense counsel's performance fell below an objective standard of reasonableness and that this substandard

performance caused defendant prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different. *People v. Wheeler,* 401 Ill. App. 3d 304, 313 (2010). The defendant must establish both prongs of this two-part test (*People v. Edwards,* 195 Ill. 2d 142, 163 (2001)), and the defendant bears the burden of demonstrating he received ineffective assistance of counsel (*People v. Valladares,* 2013 IL App (1st) 112010, ¶ 52).

¶ 74 It must be also be noted that effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer,* 162 Ill. 2d 465, 476 (1994). Thus, a petitioner must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Mims,* 403 Ill. App. 3d 884, 890 (2010). "Decisions involving what evidence to present and which witnesses to call fall within the broad category of trial strategy and are not subject to a claim of ineffective assistance unless they deprive a defendant of a meaningful adversary proceeding." *People v. Smith,* 2012 IL App (1st) 102354, ¶ 86 (citing *People v. Hamilton,* 361 Ill. App .3d 836, 847 (2005)). Similarly, " '[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court.' " *People v. Lacy,* 407 Ill. App. 3d 442, 461 (2011) (quoting *People v. Pecoraro,* 175 Ill. 2d 294, 326–27 (1997)).

¶ 75 We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 76 On appeal, defendant specifically complains that during cross-examination of Bianca his defense counsel improperly elicited inadmissible hearsay evidence that Bianca's friend Jacqueline also identified defendant as the shooter. Defendant cites to defense counsel's cross-examination of Bianca about the encounter she and Jacqueline had with defendant the day after the shooting, and specifically faults defense counsel for eliciting an affirmative answer from Bianca to the

following question: "Jackie told you it turns out I know who the shooter is?" Defendant contends that he was prejudiced by this response and defense counsel's repeated assertion during closing argument that "Bianca and Jackie decided to put this case on [defendant]," as it "led the jury to believe that another witness identified Defendant as the perpetrator" without any reasonable trial strategy to support the decision to elicit this testimony. We disagree.

¶ 77    As an initial matter, we reiterate the highly deferential standard we apply to challenges to a defense counsel's decisions involving what evidence to present. *Supra*, ¶ 65. Here, while defendant challenges his defense counsel's cross-examination of Bianca, he makes no assertion that he was deprived of a meaningful adversarial proceeding and the record does not support such a finding.

¶ 78    Moreover, the record reveals that the challenged cross-examination was part of a broader trial strategy and was intended to provide evidence to support defense counsel's theory of the case: *i.e.*, that Bianca and Jacqueline together conspired to initially "put this case on" defendant because their boyfriends were members of the Latin Brothers and defendant was from Spanish Cobra territory. Having elicited this testimony, defense counsel filled his closing argument with references to Bianca and Jacqueline as "two Latin Brother girls, whose boyfriends are Latin Brothers" that "decided to put this case on Miguel Vazquez, to lie and say it was him." Defense counsel clearly decided, as a matter of trial strategy, that it was better to argue that *both* Bianca and Jacqueline—both dating Latin Brothers—conspired to take this action as opposed to simply arguing that Bianca did so alone.

¶ 79    Even if we were to disagree with this strategy, it is well settled "that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight."

*People v. Perry*, 224 Ill. 2d 312, 344 (2007). A mistake in trial strategy or an error in judgment will not render representation constitutionally defective. *Id.* at 355-356. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.* Again, defendant does not assert he was deprived of a meaningful adversarial proceeding, and the record does not support such a finding.

¶ 80    Even if defendant had demonstrated deficient performance, he would still have the burden to establish prejudice. *Edwards,* 195 Ill. 2d at 163. "The erroneous admission of hearsay evidence is harmless error 'when it is merely cumulative or is supported by a positive identification and other corroborative circumstances.' " *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 65 (quoting *People v. Prince,* 362 Ill. App. 3d 762, 776 (2005)). Here, even if defense counsel improperly elicited inadmissible hearsay evidence that Jacqueline identified defendant as the shooter, that evidence was merely cumulative of the four other witnesses at trial who positively identified defendant as the shooter. As such, we find that he has failed to establish that he was prejudiced by defense counsel's purported ineffective assistance.

¶ 81    Finally, defendant asserts that he was denied a fair trial when, during its rebuttal closing argument, the State commented: "We did not have Jackie Miranda, but it wasn't for lack of trying. We tried to get her. We couldn't get her." Defendant contends that this comment was improper and prejudicial because it: (1) was not based upon any evidence admitted at trial, (2) suggested that Jaqueline would have provided testimony favorable to the State, and (3) served only to call attention to the hearsay identification evidence defendant contends defense counsel improperly elicited from Bianca. Acknowledging that he failed to preserve this issue with an objection at trial and by raising it in his posttrial motion, defendant asks this court to review it for plan error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve a claim for review, a defendant must both object

at trial and include the alleged error in a written posttrial motion).

¶ 82     The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error." *People v. Herron,* 215 Ill. 2d 167, 186 (2005). The plain-error doctrine is applied where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007). In either circumstance, the burden of persuasion remains with the defendant. *Herron,* 215 Ill. 2d at 182. Here, defendant only asserts plain error under the first prong of the plain-error doctrine. We begin a plain-error analysis by determining if there was reversible error in the first instance, as "[a]bsent reversible error, there can be no plain error." *People v. Cosby*, 231 Ill. 2d 262, 273 (2008).

¶ 83     A defendant "faces a substantial burden in attempting to achieve reversal of his conviction based upon improper remarks made during closing argument." *People v. Moore,* 358 Ill.App.3d 683, 693 (2005). As this court has recognized:

> "A prosecutor is allowed wide latitude during closing arguments. [Citation.] A prosecutor may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant. [Citation.] Remarks made during closing arguments must be examined in the context of those made by both the defense and the prosecution." *People v. Willis*, 409 Ill. App. 3d 804, 813 (2011).

In addition, "a prosecutor may respond to comments made by defense counsel that invite a

response. [Citation.] Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 85.

¶ 84 "The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error. [Citations.] A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83.

¶ 85 First, we do not believe that defendant has demonstrated that the State made any improper remarks in its rebuttal closing argument. Contrary to defendant's contention, there was some evidence in the record to support the State's remarks about Jacqueline's absence as a trial witness where Swiderek testified he and his partner "attempt[ed] to locate Jacqueline Miranda to show her the photo spread. Were unable to." The comments defendant complains of were arguably a fair, reasonable inference based upon that evidence.

¶ 86 Even if that was not so, we have no doubt that the State's remarks were a proper response to comments by defense counsel in closing argument that invited a response. Defense counsel specifically noted in his argument that "Jackie Miranda, who supposedly knew Prieto, supposedly, she is not a witness in this case. You didn't hear from her." If anything, this remark was designed to discredit Bianca's rendition of the encounter she and Jacqueline had with defendant the day after the shooting, after which the police were informed of defendant's nickname, and to imply that there was some reason the State did not present her testimony. The State was entitled to respond to that assertion.

¶ 87 Finally, even if we concluded that the State's remarks were somehow improper, we will find reversible error only if the defendant also demonstrates that the remarks were so prejudicial

that real justice was denied or the verdict resulted from the error. *Jackson*, 2020 IL 124112, ¶ 83. A "significant factor in reviewing the impact of a prosecutor's allegedly improper comments on a jury verdict is whether the comments were isolated and brief within the context of a lengthy closing argument." *People v. Woods*, 2011 IL App (1st) 091959, ¶ 42. Here, defendant complains of a single comment by the State regarding Jacqueline in a closing argument that, including rebuttal, ran for nearly 40 pages. Moreover, the alleged prejudice identified by defendant—that the State's comments improperly suggested that Jaqueline would have provided testimony favorable to the State and served only to call attention to the hearsay identification evidence defendant contends defense counsel improperly elicited from Bianca—is unconvincing where we have already concluded that his own defense counsel elicited this same evidence pursuant to his chosen trial strategy.

¶ 88    Having found no reversible error with respect to this issue, we conclude that there can be no plain error. *Cosby*, 231 Ill. 2d at 273.

¶ 89    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 90    Affirmed.